U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

APR - 3 2017

TONY R. MOORE, CLERK
BY: _____
DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **TYLER RENWICK** | * | **CIVIL ACTION NO. 2:15-CV-02316** |
| | * | |
| **V.** | * | |
| | * | **JUDGE JAMES T, TRIMBLE, JR.** |
| **PNK (LAKE CHARLES) LLC** | * | |
| | * | |
| | * | **MAGISTRATE JUDGE KAY** |
| | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the defendant, PNK (Lake Charles) LLC, seeking dismissal of all claims by the plaintiff, Tyler Renwick. (Rec. Doc. 30). The plaintiff filed a response in opposition to the motion for summary judgment (Rec. Doc. 32), and the defendant filed a reply to the response, (Rec. Doc. 37). For the reasons expressed below, the court finds that the motion for summary judgment should be **GRANTED**, dismissing all claims against the defendant, PNK (Lake Charles) LLC, with prejudice.

### STATEMENT OF FACTS

Defendant, PNK (Lake Charles) LLC ("PNK") d/b/a L'Auberge du Lac Hotel & Casino ("L'Auberge") is a limited liability company doing business in Louisiana.[1] In 2007, PNK hired general contractor John C. Myers d/b/a John C. Myers Distributing ("JC Myers") for maintenance services related to cleaning exhaust hoods and kitchen ovens at L'Auberge in Lake Charles, Louisiana.[2] Prior to being hired, JC Myers brought in PB Technology, LLC ("PB") to

---

[1] Corporate Disclosure Statement (Rec. Doc. 9).

[2] Deposition of JC Myers (Rec. Doc. 30-6, p. 22-23).

make a bid to perform kitchen vent cleaning services at L'Auberge.[3] L'Auberge accepted the bid, and JC Myers and PB started performing the cleaning services at L'Auberge in August, 2007.[4]

PB is located in Austin, TX and performs kitchen vent cleaning services for clients across four states.[5] PB sends its work crews from its Austin location to each job site via PB vans and trailers, which carry the necessary equipment and tools.[6] Plaintiff, Tyler Renwick ("Renwick"), a resident of Texas, was an employee of PB and one of its crew members for the services PB provided at L'Auberge.[7]

At the L'Auberge hotel, kitchen ventilation equipment was located inside the restaurant kitchens and on the roof and side of the hotel.[8] PB's work was performed at night after the hotel's restaurant kitchens closed for the evening.[9] PB brought their own cleaning equipment and supplies and performed their work unsupervised by L'Auberge personnel.[10] Part of PB's work performance at L'Auberge required PB crew members to access kitchen ventilation equipment located on the roof and one side of the hotel.[11] To access the rooftop vents, PB crew members climbed a ladder which was tied to the railing of the roof of the adjacent L'Auberge casino vessel and leaned against the hotel structure so that PB crew members could access the roof of

---

[3] *Id.* at 22, 30-31.

[4] *Id.* at p. 35; 30(b)(6) Deposition of PB, Paul Barnes (Rec. Doc. 30-5, p. 38) (hereinafter "Deposition of Paul Barnes").

[5] Deposition of Paul Barnes (Rec. Doc.30-5, pp. 5, 24).

[6] *Id.* at pp. 52-54.

[7] Pl. Complaint (Rec. Doc. 1, paras. II, VI) (The plaintiff amended his original complaint to substitute the name of the defendant but maintains the allegations of fact and circumstances of the original complaint. (Rec. Doc. 6, para. 1)).

[8] *See* Deposition of Robert Gee (Rec. Doc. 30-11, pp. 22-24).

[9] Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 37-38).

[10] *See id.* at pp. 38, 83-84.

[11] *Id.* at pp. 25-26.

the hotel.[12] The ladder crossed a two to three foot gap between the casino vessel and the hotel structure.[13]

In the early morning hours of July 14, 2015, Renwick climbed a ladder from the roof of the casino vessel to the roof of the hotel structure to turn off a ventilation fan located on the roof of the hotel structure.[14] Before completing his transfer from the ladder to the roof of the hotel structure, Renwick fell to a gangway approximately 50 feet below.[15]

Renwick suffered injuries from the fall and brings claims against PNK on theories of vicarious and direct liability under Louisiana tort law for the injuries he sustained from using an alleged defective ladder attached to the railing on the roof of the casino vessel.[16]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] "A fact is material only when it might affect the outcome of the suit under the governing law, and a fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party."[18] The moving party bears the initial burden of showing that there is an absence of a genuine issue of material fact.[19] After such a showing, the burden shifts to the non-movant to show that there is a genuine factual issue for trial by citing specific evidence in the record,

---

[12] *Id.* at pp. 83-85.

[13] *Id.* at p. 46.

[14] Deposition of Tyler Renwick (Rec. Doc. 30-10, pp. 102-108).

[15] *Id.* at 108, 112-13; Def. Statement of Uncontested Material Facts (Rec. Doc. 30-4, no. 10); Pl. Opp. to Statement of Material Facts (Rec. Doc. 32-9, no. 10).

[16] Pl. Complaint (Rec. Doc. 1).

[17] Fed. R. Civ. P. 56(a).

[18] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[19] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

beyond the pleadings, that supports its assertions that a material fact is genuinely in dispute.[20] "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."[21] The court will construe all evidence in the light most favorable to the nonmoving party, but will not infer the existence of evidence not presented.[22]

## LAW AND ANALYSIS

The plaintiff's claims are based in theories of vicarious and direct liability under Louisiana tort law. This court has subject matter jurisdiction based on the diversity of citizenship of the parties and the amount in controversy.[23] As a diversity action brought within the state of Louisiana, the court must apply Louisiana's choice-of-law rules.[24] Under Louisiana law, delictual and quasi-delictual claims are generally governed by the law of the state whose policies would be most seriously impaired if its law were not applied.[25] The work performed by the plaintiff for the defendant was done on property within the state of Louisiana, the accident happened in the state of Louisiana, and the defendant is a company doing business in the state of Louisiana. The court believes these facts speak to the policy concerns cited in La. Civil Code art. 3542 in support of applying Louisiana law. Thus, the court considers this motion for summary judgment under Louisiana law.

---

[20] *Id.* at 324; *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 176 (5th Cir. 2016) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

[21] *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Sec. & Exch. Comm'n v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

[22] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

[23] 28 U.S.C. § 1332.

[24] *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[25] La. C.C. art. 3542.

The plaintiff claims that PNK is vicariously and directly liable for his injuries. Specifically, Renwick claims that PNK did not provide him with a safe means of accessing the kitchen vents on the roof of the hotel structure because the ladder PNK provided was defective. The plaintiff also claims that PNK is liable for a defect in the ladder which was under PNK's custody or "garde" and that PNK failed to protect the employees of PB by providing a safe work environment on its premises. PNK claims that it had no duty to supervise the employees of an independent contractor and did not provide PB with the defective ladder used by Renwick. PNK also claims that it did not have garde over the ladder, and that climbing ladders is not inherently dangerous.

### I.    *Vicarious Liability: Did PNK Owe Renwick a Duty?*

PNK claims that it had no duty to Renwick because Renwick was the employee of an independent contractor.  PNK maintains that it did not have operational control over the work performed by PB employees, and furthermore, climbing a ladder is not an inherently dangerous activity. Renwick admits that he was an employee of PB, but avers that PNK had control over the method and means in which PB employees performed their work and/or PNK gave implied authorization for PB's use of a defective ladder.

Under Louisiana law, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[26] A building owner is generally not liable for the negligence of an independent contractor in the performance of work unless the building owner controlled the work or the work was inherently dangerous.[27] Louisiana courts consider the

---

[26] La. C.C. art. 2315.

[27] *Meaux v. Wendy's Int'l Inc.*, 51 So.3d 778, 784 (La.App. 5 Cir. 10/26/10) (citing *Villaronga v. Gelpi P'ship No. 3*, 536 So.2d 1307, 1310-11 (La.App. 5 Cir. 1988)); *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 380 (5th Cir. 2001) (citation omitted).

following factors in the independent contractor analysis: 1) "the existence of a contract for the performance of a specific job," 2) "payment of a fixed price for the work," 3) "employment by the contractor of assistants who are under his control, and" 4) "the furnishing of tools and materials and the right to control the conduct of the work while in progress."[28]

A.  *Independent Contractor*

Looking to the first two factors, neither party has provided evidence that written contracts existed prior to Renwick's accident. However, it is undisputed that PB was hired to perform the discrete job of cleaning the kitchen ventilation equipment at the L'Auberge hotel.[29] The testimony of Paul Barnes, on behalf of PB, and JC Myers makes clear that PB was a subcontractor for JC Myers for the work PB performed at L'Auberge.[30] Regarding the third factor, it is undisputed that Renwick was an employee of PB who performed work for PB at L'Auberge.[31] Finally, as to the fourth factor, it is undisputed that PNK was not expected to supervise the details of PB's work performance, and that PB was expected to furnish their own equipment.[32]

The deposition testimony of Paul Barnes, on behalf of PB; the operations manager of PB, Robert Gee; and JC Myers sheds light on the nature of this last factor. Paul Barnes described how PB determines the proper tools and equipment required to complete each job:

---

[28] *Meaux*, 51 So.3d at 784 (citing *Villaronga*, 536 So.2d at 1311).

[29] *See* Def. Statement of Uncontested Material Facts (Rec. Doc. 30-4, no. 2); Pl. Opp. to Statement of Material Facts (Rec. Doc. 32-9, no. 2).

[30] The plaintiff denies that PB was a subcontractor to JC Myers, claiming that PB took over a portion of JC Myers' work. However, the plaintiff does not point to anything in the record to support this claim, and the evidence presented by the defendant contradicts this statement. The defendant points to the deposition testimony of both Paul Barnes and JC Myers describing PB as JC Myers' subcontractor. *See e.g.*, Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 33-34); Deposition of JC Myers (Rec. Doc. 30-6, pp. 22-23).

[31] Pl. Opp. to Statement of Material Fact (Rec. Doc. 32-9, nos. 5, 7).

[32] Pl. Opp. to Statement of Material Facts. (Rec. Doc. 32-9, nos. 3, 15, 16).

Every job that we do, every new customer that we have, the first thing that has to happen is, I have to do the initial inspection. In that initial inspection, I look for all aspects of the job. We need a 10-foot ladder; we need a 3-foot ladder; we need additional hoses; we need power washers.

Then on – the first person to go out to the new job with the crew is going to be Robert. He goes out to every new job. And then he assesses the situation, what we need and what we don't need. The guys have a real bad habit of pulling the trailer – of loading the extension ladder a little bit too far back, so when they back up, it pokes a hole in the trailer. So when they leave, they leave with the specific amount of equipment that they are going to need. You don't give them an extension ladder if they are going to go to a Whole Foods. And it's not necessarily because it would be broken, but – but we check and make sure they have everything that they need before they leave to go on the job. It's part of our work order.[33]

The general contractor, JC Myers, also testified that he expected his subcontractor, PB, to provide correct tools and equipment for PB's employees.[34] The operations manager, Robert Gee, described the manner in which PB conducts its work and assigns tasks, with a hierarchical component:

Q: Okay. You got your team leader. What are his responsibilities on a job?

A: His responsibilities, if I'm not on the job, is to give instructions to everybody, tell them what they're going to be doing, indicate what job – which hoods are going to be done, take care of all the pictures, all the paperwork. And like I said before, a glorified gofer.

Q: Okay. And then you've got your technicians, I guess you call them –

A: Yes, technicians.

Q: -- doing what?

A: Well, they're doing – they're getting up in there and they're scraping the grease out or scrubbing it down or setting up the equipment or hanging up the plastic or – you know, doing all that kind of stuff. Getting the job site set up.[35]

---

[33] Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 83-84).

[34] Deposition of JC Myers (Rec. Doc. 30-6, p. 48).

[35] Deposition of Robert Gee (Rec. Doc. 30-11, pp. 27)

Paul Barnes also testified to the manner in which PB's crews were run at the L'Auberge job site:

> Only certain ones are allowed to go up on a roof. If they are not trained to be on the roof, they are not going to go up on the roof. And so as far as staging, you know, again, they would stage – staging would involve for us deciding who is going to do what and then setting up the equipment outside and inside, pulling filters. So you have those things to do before somebody would go up on a roof.
>
> And the team leader – which at that time, we actually had two people in training. They could have easily been the team leaders, but the older team leader ran. And typically, it's the team leader that will run up there and turn off the fans. We don't send people in any area of work that they have not already been trained on. If that answers the question.[36]

Under the four-factor analysis, Tyler Renwick was the employee of a subcontractor to a general contractor performing services for PNK at L'Auberge. As a PB employee, he was under PB supervision while on the job, and PB was expected to provide the proper tools and equipment to complete the job. As such, the court considers whether PNK is liable as a building owner for the negligent acts of its independent contractor.

Under Louisiana law, a building owner may only be held liable for the negligent acts of an independent contractor under two exceptions: 1) if "the person for whom the work is performed gives express or implied authorization to an unsafe practice or has the right to or exercises operational control over the method and means of performing the work," or 2) if "the work undertaken by the independent contractor is inherently or intrinsically dangerous."[37]

*B. Operational Control or Authorization to an Unsafe Practice*

    *i. Operational Control*

---

[36] Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 58-59).

[37] *Meaux*, 51 So.3d at 785 (citing *Villaronga*, 536 So.2d at 1310-11).

Under the first exception, Renwick must show either that PNK had operational control or that PNK gave express or implied authorization to the unsafe practice of using a defective ladder. "To find operational control[,] '[t]here must be such a retention of right of supervision that the contractor is not entirely free to do the work in his own way.'"[38] "Such operational control must consist of more than the simple power to order a stop to or resumption of work, the right to inspect the work or receive progress reports, the right to make non-binding recommendations, or the right to dictate 'alterations or deviations.'"[39] "The presence of a company man or representative, even one making inspections, is not sufficient to put the principal in operational control."[40]

PNK claims that it did not have operational control over the work PB performed at L'Auberge. Neither party disputes that PNK was not expected to supervise PB employees during the course of their performance while on the L'Auberge property.[41] Renwick, however, denies that PNK had no control over the method and means of performing the work because PNK "specified the precise manner of access [between the structures], provided the means of access, and controlled entry to and from the casino vessel rooftop."[42] Renwick has not pointed to evidence that rises to the level necessary to find that there is a genuine dispute as to whether PNK exercised operational control.

---

[38] *Skinner v. Schlumberger Tech. Corp.*, No. 13-03146, 2015 WL 4253986, at *3 (W.D. La. 7/13/15) (quoting *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989)); *see also Grammer v. Patterson Servs., Inc.*, 860 F.2d 639, 644 (5th Cir. 1988).

[39] *Skinner*, 2015 WL 4253986. at *5 (citing *Landry*, 889 F.2d at 1471).

[40] *Id.* (citing *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003)).

[41] Pl. Opp. to Statement of Material Facts. (Rec. Doc. 32-9, no. 3).

[42] *Id.* at no. 4.

The first two assertions are closely related. First, for the purposes of this motion, PNK does not dispute that during an initial walkthrough of the premises in 2007,[43] a L'Auberge employee identified a point of access to the hotel roof from the rooftop of the casino vessel and identified that a ladder was used to traverse the two structures.[44] Renwick, however, contends that PNK required PB employees to use the specific ladder that was on the roof at that time, but does not cite to evidence showing that PNK required this. "[U]nsubstantiated assertions...do not adequately substitute for specific facts showing a genuine issue for trial."[45] In fact, there is evidence to the contrary. PNK cites to the deposition testimony of JC Myers regarding the proposition that PNK required anyone to use the ladder that they saw on the roof that day:

> Q: And when you said you looked at it and you said you hope you're not using it, did anybody suggest to you that you had to use that ladder?
> A: No.[46]

The evidence presented shows, at most, that a L'Auberge employee made a non-binding recommendation to use the ladder that was on the roof at that time. This alone does not rise to the level of operational control. This possible recommendation, however, speaks to Renwick's second assertion that PNK provided the ladder for PB to use. PNK denies this claim.

PNK cites to the deposition testimony of Anthony Long that PNK had no knowledge or documentation of any ladders on the roof of the casino vessel.[47] Paul Barnes also testified that

---

[43] Based on deposition testimony, Paul Barnes and JC Myers participated in a walkthrough which consisted of a tour of the relevant work areas at L'Auberge by a L'Auberge employee. *See* Deposition of JC Myers (Rec. Doc. 30-6, pp. 31-32); Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 34-35).

[44] Motion for Summary Judgment (Rec. Doc. 30-3, pp. 5-6).

[45] *TIG Ins. Co.*, 276 F.3d at 759.

[46] Deposition of JC Myers (Rec. Doc. 30-6, p. 56).

[47] 30(b)(6) Deposition of PNK, Anthony Long (Rec. Doc. 30-7, pp. 11-13) (hereinafter "Deposition of Anthony Long").

PB did not know where the ladders that they found on the roof came from.[48] In its motion for summary judgment, PNK points to evidence that shows PB considered whether and what type of ladders, including extension ladders, were necessary when determining what equipment they needed to bring in order to complete a job.[49] The defendant also cites Renwick's own testimony that he did not know who owned the ladder or who had set it up, but rather followed the direction of his supervisor to use the ladder they found on the roof:

> Q: Okay. The first time you were on that roof, do you know who set up the ladder in the place where it was located?
>
> A: No, sir.
>
> Q: Okay. Do you know if it could have been there from the last time PB did its work?
>
> A: I mean, anything's possible. But it was – it was always set up there. You know, when we were there, it was always – you know, it was always there. That was just the way we accessed the roof. We didn't have to mess with it or anything. It was just provided for us.
>
> Q: Well, how do you know it was provided by – when you say "provided for us," I assume you mean provided by L'Auberge.
>
> A: I mean, that, I don't know. I can't speculate who installed that and for what reason, but that was the way – the preferred method, from what I was told, to get onto that roof.
>
> Q: Okay. Do you know if Robert Gee had ever inquired about any other alternate methods of getting on the roof?
>
> A: That, I couldn't tell you. I just – when he taught me how to access the roof, I took the route he gave me and I didn't ask questions. I just did it as I was told.[50]

PNK also cites testimony of JC Myers who believed PB had been bringing their own ladder for at least a year, and did not expect PB to use the ladder that they saw on the rooftop during his initial walkthrough:

---

[48] Deposition of Paul Barnes (Rec. Doc. 30-5, p. 13).

[49] *See* Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 83-84).

[50] Deposition of Tyler Renwick (Rec. Doc. 30-10, pp. 79-80).

A: There was – the one time I went up there and looked, there was part of – well, first there was an old wooden ladder. And I told them that had to go, you know. It was just against OSHA. And then for a while, they were bringing their own extension ladder up there.

Q: Okay.

A: My guys.

Q: PB?

A: Yeah. They were bringing their own extension ladder up there, and one of the guys dropped half of it overboard….And I don't know where the other one came from. I just know they had a ladder up there that they were using.

….

Q: Do you know over what period of time PB was bringing their own ladder?

A: I can't give you a definite time. At least a year. I don't know.[51]

….

Q: All right. And how was it – how did you become aware that PB had brought their own extension ladder for a while?

A: Robert told me about the incident where one of the guys dropped half of it overboard. That's the only –

Q: So you knew they had brought it because he told you that they had dropped half?

A: They always have got one on the van. They'll carry a 6 foot, 8 foot folding ladder, and then they'll carry an extension ladder. Because you know, you have to get on the roof of the buildings. We've always got an extension ladder.[52]

Paul Barnes also testified that PB had used its own ladder once to transfer between the casino vessel and the hotel rooftop:

Q: Okay. Had PB Technology ever brought their own ladder to use for transfer between the L'Auberge casino and the hotel?

A: One time.

Q: And what kind of ladder was that?

---

[51] Deposition of JC Myers (Rec. Doc. 30-6, p. 46).

[52] *Id.* at 56-57.

> A: Just a regular extension ladder. And it would have been secured pretty much the same way that one is, but it would have been both parts.[53]

PNK also cites the deposition testimony of Paul Barnes where he discussed PB's decision to use the ladders they found on the roof after an initial proposal to PNK that a permanent catwalk be constructed was rejected:

> Q: Okay. And then between September, October of 2007 forward, what other communications, if any, were there with John Myers or someone else at L'Auberge about roof access; if anything?
>
> A: Right. I don't recall. I think after that, we just ran up and down the ladder. It didn't seem to be that big of a deal. I mean, even back in 2010, I'm still old and fat, and depending on – you know, where the ladder – where the ladders came from or not, they were – they seemed fine. The wooden one wasn't. That was in the very beginning when we started, but that one disappeared after a couple of months.[54]

In response, Renwick claims there was a clear implication that PNK provided the ladders on the roof. The testimony on which the plaintiff relies shows that during PB's orientation tour of L'Auberge in 2007, the owner of PB was told by a L'Auberge employee that people use the ladder that was on the roof to cross from the casino vessel to the hotel roof:

> And one of the things that – in August – was there was an old wooden ladder that went between the two buildings, you know, leaned up against it. And so over time – I'm going to summarize this real quick – over time, that ladder has been replaced by other ladders. I have no idea where they come from. We were told that was the way they get from the casino, the boat, to the – to the other building.[55]
>
> ....
>
> Q: Because something in your – in the production said that a ladder was being used as early as 2007.

---

[53] Deposition of Paul Barnes (Rec. Doc. 30-5, p. 79).

[54] Deposition of Paul Barnes (Rec. Doc. 30-5, p. 40).

[55] Deposition of Paul Barnes (Rec. Doc. 30-5, p. 14).

> A: Right. It was – it was there before we got there. So when we started, that was – they explained to us that – and when I did the inspection, I used that wooden ladder to get back and forth as well; that that was their only way to get back and forth between – and that's the – I was told that's the same thing all the vendors and L'Auberge employees used to get back and forth.[56]

Renwick also cites to testimony that PB used the ladders they found on the roof of the casino vessel:

> Q: On the evening of this accident, can you tell me who first erected the ladder before Mr. Renwick's accident?
>
> A: That's the way it is on the roof. Those ladders are always up there, tied off, and lean, you know, within a few degrees of the side exhaust fans, so that there's always something there. We don't erect them. They are there, and we use them.[57]

None of the evidence cited by either party shows that there were discussions between PNK and PB about providing a ladder or that PNK knew of any ladders on the roof other than the wooden ladder identified by a L'Auberge employee in 2007, which was removed within a few months after the initial walkthrough with PB and JC Myers. Further, the testimony presented shows that determining what ladders to use was within the scope of PB's work order, and that they decided sometimes to use their own ladder and sometimes to use ladders they found without knowing from where or from whom the ladders came. This evidence further buttresses PNK's assertion that PB was free to conduct the work in its own way and does not put PNK in operational control.

The last factor that Renwick claims gave PNK operational control is that PNK employees had to grant PB employees access to the rooftop. Renwick does not cite to any information supporting this contention, but even if he had, "[t]he presence of a company man or

---

[56] *Id.* at p. 34.

[57] *Id.* at p. 84-85.

representative, even one making inspections, is not sufficient to put the principal in operational control."[58] None of the evidence presented shows that PNK had operational control over PB's work at L'Auberge. Thus, we find that PNK did not have operational control of the work PB performed at L'Auberge.

*ii. Authorization to an Unsafe Practice*

Renwick alleges that PNK knew that PB was using defective ladders on the casino vessel's rooftop during the eight years that PB performed kitchen vent cleaning services at L'Auberge, thus inferring that PNK gave implied authorization to the unsafe practice of PB employees using defective ladders. In support of this claim, Renwick cites the deposition testimony of Paul Barnes that PNK was supplied with pictures of "work that [PB does] before and after." Renwick also claims that, based on the positioning of the casino vessel's wheelhouse, the casino vessel captain should have been able to see that PB employees were using these ladders. Renwick further contends that the fact that there were different ladders on the roof throughout the eight years that PB cleaned L'Auberge's kitchen vents, and that the casino vessel crew at one time had a rolling scaffolding on the roof, implied that PNK knew that PB employees were using ladders that were already on the roof of the casino vessel. Finally, Renwick asserts that the casino vessel rooftop and accessories would have been inspected by PNK personnel to comply with annual Coast Guard inspections.

Renwick does not carry his burden to show that there is a genuine dispute as to whether PNK gave express or implied authorization to PB employees using defective ladders. Renwick cites the testimony of Paul Barnes regarding the work photographs provided to PNK, but this testimony gives no indication that the photographs would show the manner in which PB

---

[58] *Skinner,* 2015 WL 4253986, at *3 (citing *Fruge*, 337 F.3d at 564).

employees traversed the two structures.[59] The photographs that Renwick attaches as exhibits to his memorandum in opposition likewise do not show PB employees using any ladder that was on the rooftop.[60]

Renwick's contention that the casino vessel's captain should have been able to see that PB employees were using ladders is unsupported by evidence. Renwick does not cite to any evidence that the wheelhouse captain or any other vessel or hotel crew were present during the times that PB employees were working on the rooftops.

Renwick contends that the existence of rolling scaffolding on the roof of the casino vessel implies that the ladders on the rooftop also belonged to the casino vessel's crew which, in turn, implies that the defendant knew that PB employees were using those ladders. Again, Renwick points to no evidence to support this assertion and this court is unwilling to take such a leap to infer that PNK provided and/or implicitly gave PB employees the authority to use a defective ladder to traverse from the vessel to the hotel rootop. The defendant cites to deposition testimony of PNK's representative, providing that PNK did not have knowledge or documentation of ladders on the casino vessel's roof.[61] The defendant also cites to Paul Barnes' testimony that he did not know where the ladders that were found on the rooftop over the years came from.[62]

Finally, regarding the annual inspections, Renwick points to no evidence tending to show when any inspection took place and whether the defective ladder in question, or any other ladder,

---

[59]    Q: There's been reference in some of the materials to actually taking photographs of work that you do before and after.

    A: Right.

Deposition of Paul Barnes (Rec. Doc. 30-5, p. 103).

[60] *See* Pl. Opp. to Motion for Summary Judgment at Exhibits E, C, C.1, F, and G.

[61] Deposition of Anthony Long (Rec. Doc. 30-7, pp. 11-12)).

[62] Deposition of Paul Barnes (Rec. Doc. 30-5, p. 14).

was in place at the time of the last inspection. "Conclusional allegations and denials, speculation, improbable inferences, [and] unsubstantiated assertions…do not adequately substitute for specific facts showing a genuine issue for trial."[63] The court will not infer the existence of evidence not presented. Thus, the court finds no triable issue of fact as to whether PNK gave express or implied authorization to PB's use of a defective ladder.

C. *Inherently Dangerous*

The second exception applies if the plaintiff can show that the work he performed for the defendant was "inherently dangerous." An "inherently dangerous" activity is one which can cause injury to others even when performed with the utmost prudence and care.[64] Thus, if no such hazard exists when the activity is performed in a "proper and workmanlike manner," the activity is not "inherently dangerous."[65]

PNK claims that the activity of climbing a ladder is not inherently dangerous citing the deposition testimony of Paul Barnes, Robert Gee, and Occupational Safety and Health Administration ("OSHA") ladder safety material.[66] In the deposition of Paul Barnes, Barnes states that climbing a ladder between the two structures could be performed safely if using a non-defective ladder which was tied off and inspected prior to use in accordance with OSHA training:

> Q: All right. So let me ask you this: It seems that you are aware of – you can see that a ladder transfer between the two buildings was not a safe transfer?
>
> A: With the proper ladder, it could be, you know – and if it's tied off, and – the ones I have used in the past, I don't – I don't recall if

---

[63] *TIG Ins. Co.*, 276 F.3d at 759.

[64] *Meaux*, 51 So.3d at 786 (citing *Vicknair v. Boh Bros. Constr. Co. L.L.C.*, 871 So.2d 514, 521 (La.App. 5 Cir. 2004)); *Roberts*, 266 F.3d at 380 (citing *Kent v. Gulf States Utils.*, 418 So.2d 493, 498 (La. 2001).

[65] *Meaux*, 51 So.3d at 786 (citing *Buras v. Lirette*, 704 So.2d 980, 983 (La.App. 4 Cir. 12/2397)).

[66] Def. Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 30-3, pp. 8-9).

I used this one or not. I check – before I climb on any ladder, I check it and make sure – and everybody knows that's got OSHA training for ladders, you always check them. This looks like fiberglass. So anybody that climbs on ladders for us, looking for cracks first before they get on a fiberglass ladder to make sure it's you know, secure. And you can always fall.[67]

Paul Barnes and Robert Gee, likewise, agreed that following OSHA rules regarding working at heights and the use of ladders would have protected against the type of accident that Tyler Renwick experienced.

Q: And you agree that there are government agencies that create rules to protect employees from dangerous situations, like OSHA?

A: Yes.

Q: Okay. Do you believe that violating an OSHA rule is never a prudent thing to do?

A: Correct.

Q: Okay. And you agree, also, that there are specific rules that must be followed when working at heights –

A: Yes.

Q: -- like the rules provided by OSHA that we've talked about, correct?

A: Correct.

Q: And you also agree that OSHA exists to protect employees from unnecessary injury on the job?

A: Correct.

Q: And do you believe that using a fall protection and a –

A: Lanyard.

Q: -- a lanyard and non-defective-type ladder is – would protect against the specific type of accident that Tyler Renwick was involved in?

Q: Yes.[68]

---

[67] Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 75-76).

[68] Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 81-82).

Q: And do you agree that OSHA does provide specific rules that need to be followed when working at heights, right?

A: Yes.

Q: And they also provide specific rules that need to be followed when using ladders, correct?

A: Yes.

Q: And you agree that OSHA exists to protect employees?

A: Most definitely.

Q: Okay. And do you agree that fall protection equipment protects against the specific type of accident that are [sic] Tyler Renwick was involved in?

A: Yes. It could have.

Q: And do you agree that using a ladder that's not defective would protect against the specific type of accident that Tyler Renwick was involved in?

A: Yes. If it was not defective.[69]

Renwick argues that PNK should have told PB about a *safer* route to access the vents on the hotel roof, but points to no evidence in the record that shows that climbing a ladder could not be performed safely when following PB internal policies and OSHA standards for climbing ladders.[70] Thus, Renwick has not carried his burden to show that there is a genuine dispute as to whether PNK is liable for negligence under this exception to the rule.

Without carrying his burden to show that an exception to the general rule that a building owner is not liable for the negligence of an independent contractor, Renwick has not shown that PNK owed a duty to Renwick that would expose PNK to liability under this theory of negligence.

---

[69] Deposition of Robert Gee (Rec. Doc. 30-11, pp. 59-60).

[70] Renwick claims that PNK was negligent because it did not tell PB about a safer access route to the hotel. However, Renwick cites no legal support for this position, nor has evidence been presented that PNK knew about an alternate access route prior to Renwick's accident. *See* Pl. Memorandum in Opp. to Motion for Summary Judgment (Rec. Doc. 32, pp. 14-15).

## II.    *Direct Liability: Damage Caused by Ruin, Vice, or Defect in Things and Premises Liability*

Renwick contends that PNK is liable because of a defect in the ladder that was under the defendant's custody or control, and for failure to protect employees of independent contractors. PNK claims that it did not have custody or control of the defective ladder, and that there were no hazards inherent in the premises at L'Auberge.

### A.  *Damage Caused by Ruin, Vice, or Defect in Things*

Renwick contends that PNK had control or custody of the defective ladder that the plaintiff used on the night of his injury. PNK claims there is no evidence proving that it owned the ladder or that it had custody of the ladder. The owner or custodian of a thing may be liable for "damage occasioned by its ruin, vice, or defect."[71] First, the plaintiff must show that the defendant had custody or "garde" of a thing. This is a fact-driven determination.[72] In making such a determination, the Louisiana Supreme Court has advised courts to consider: 1) "whether the person bears such a relationship as to have the right of direction and control over the thing; and" 2) "what, if any, kind of benefit the person derives from the thing."[73]

It is unclear from the record whether PNK had garde over the defective ladder which caused the plaintiff's injury. Over the eight years that PB performed services for PNK at L'Auberge, PB found ladders set up on the roof of the casino vessel leading to the roof of the hotel structure.[74] Thus, it is possible that PNK could have used the ladder or removed it at will if PNK had become aware of the ladder's existence. Neither PNK nor PB claim to own any of the

---

[71] La. C.C. art. 2317.1.

[72] *Dupree v. City of New Orleans*, 765 So.2d 1002, 1009 (La. 8/31/00).

[73] *Id.* (citations omitted).

[74] *See* Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 13-14).

ladders that were found on the roof, or know how they came to be placed there.[75] A ladder on the roof provides a means of traversing the two structures. Thus, if PNK had the right to use the ladder, it would have had the benefit of inter-structure access. Construing the facts in the light most-favorable to the plaintiff, the court assumes for the purposes of this ruling that there is a genuine dispute as to whether PNK had garde of the ladder.

However, the analysis does not stop at the existence of garde. The ruin, vice, or defect of a thing "must constitute a dangerous condition, which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances."[76] A building owner is not shielded from liability simply because the person injured was a repairman who was injured during the course of the work he was hired to do.[77] However, "[a]n owner is not liable for injury which results from a condition which should have been observed by the plaintiff in the exercise of reasonable care or which was obvious."[78] A plaintiff who was a repairman must show that he was exposed to an unreasonable risk of harm from the defective thing.[79] Louisiana courts consider all of the circumstances of the case when determining the reasonableness of a particular risk "vis-à-vis the plaintiff and those similarly situated."[80] "[A] plaintiff's status as a repairman is a significant factor in determination of whether a risk is unreasonable."[81]

---

[75] *Id.* (citing the deposition testimony of Paul Barnes, the plaintiff, and Anthony Long, PNK's Director of Facilities testifying on behalf of PNK).

[76] *Meaux*, 51 So.3d at 788 (citing *Monson v. Travelers Prop. & Cas. Ins. Co.*, 955 So.2d 758 (La.App. 5 Cir. 4/24/07); *Loescher v. Parr*, 324 So.2d 441, 446-47 (La. 12/8/75)).

[77] *Id.* at 790 (citing *Celestine v. Union Oil Co. of California.*, 652 So.2d 1299, 1304-05 (La. 4/10/95]).

[78] *Id.* at 791 (quoting *Desormeaux v. Audubon Ins. Co.*, 611 So.2d 818, 820-21 (La.App. 3 Cir. 12/22/92), *writ not considered*, 613 So.2d 966 (La. 1993), *writ denied*, 613 So.2d 1002 (La. 1993)).

[79] *Id.* at 790 (citing *Celestine*, 636 So.2d at 1303).

[80] *Id.* (quoting) *Celestine*, 636 So.2d at 1304).

[81] *Id.* at 791 (quoting *Celestine*, 636 So.2d at 1305)).

Both parties agree that the ladder that Renwick used on the night of the accident was in a defective condition.[82] The defendant describes the ladder as the top half of an old broken extension ladder that was missing the cleated feet used for stabilization.[83] Plaintiff does not admit or deny this.[84] The depositions submitted as evidence reference photographs entered as exhibits which show, and are referred to as, the ladder that Renwick used at the time of his fall.[85] All references are made to the ladder with the above description; plaintiff has not pointed to other evidence claiming the ladder was not as described. It is also undisputed that Renwick did not inspect the ladder or the rope that tied it to the casino roof railing before he used the ladder and subsequently fell.[86] It is further undisputed that a failure to inspect the ladder prior to using it was a violation of PB's internal policies.[87]

The defendant cites the depositions of Paul Barnes, JC Myers, and Robert Gee, and the affidavit of defendant's safety expert, Dennis R. Howard, in support of its assertion that a failure to inspect a ladder prior to use was a violation of PB internal policies and OSHA regulations.[88] Paul Barnes also testified that PB does not let employees up on the roof until they have been trained on the proper use of ladders.[89] He further stated that it is PB's policy to conduct "360 meetings" with PB employees where safety training documents, including material on the safe

---

[82] *See* Pl. Opp. to Statement of Material Facts (Rec. Doc. 32-9, no. 22).

[83] Def. Statement of Uncontested Material Facts (Rec. Doc. 30-4, no. 21).

[84] *See* Pl. Opp. to Statement of Uncontested Material Facts (Rec. Doc. 32-9, no. 21).

[85] *See e.g.*, Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 79-80) (referencing the photograph of the ladder entered as exhibit 5); Deposition of Tyler Renwick (Rec. Doc. 30-10, pp. 83-86) (referencing photographs of the ladder entered as exhibits 1 and 2).

[86] *See* Pl. Opp. to Statement of Material Facts (Rec. Doc. 32-9, no. 26).

[87] *See id.* at no. 27.

[88] *See* Def. Statement of Uncontested Material Facts (Rec. Doc. 30-4, no. 27).

[89] Deposition of Paul Barnes (Rec. Doc. 30-5, pp. 48-49).

use of ladders, are handed to the employees and reviewed.[90] Paul Barnes testified that in his

employment interview with the plaintiff, the plaintiff had told him that he had had ladder

training.[91] Barnes further testified that he would have provided the plaintiff with the OSHA

materials on the safe use of ladders, asked the plaintiff to make sure he understood them, and

then started on-site training.[92] Barnes continued that part of his training program is that a

defective or a broken ladder should not be used, and that using only the top half of an extension

ladder that did not have slip-resistant cleats would be a violation of the safety policy that he

teaches his employees.[93] Paul Barnes provided PB's training log, dated May 4, 2015, which

shows that the plaintiff had had ladder training at an intermediate level.[94]

Renwick does not point to evidence that such defects would not have been obvious upon

inspection or that the risk of harm would have been unreasonable even had Renwick inspected

the ladder prior to use as required by his employer's and OSHA's policies regarding the safe use

of ladders. Thus, the plaintiff has not met his burden to show that he was exposed to an

unreasonable risk of harm, given his status as a repairman who was trained on the safe use of

ladders.

B. *Premises Liability*

Finally, PNK claims that the L'Auberge premises were not inherently dangerous relying

on a distinction made in *Roach v. Air Liquide America*[95] between hazards inherent in the

---

[90] *Id.* at p. 49.

[91] *Id.* at p. 50.

[92] *Id.*

[93] *Id.* at pp. 51-52; *see also* Deposition of Robert Gee (Rec. Doc. 30-11, p. 57) (confirming that using the top half of an extension ladder without cleats is a violation of PB ladder training).

[94] Deposition of Paul Barnes (Rec. Doc. 30-5, Tab 2).

[95] No. 2:12-3165, 2016 WL 1453074 (W.D. La. 04/11/16).

premises and those inherent in an independent contractor's job. The court in *Roach* held that the owner of the premises does not owe a duty to employees of an independent contractor for hazards inherent in an independent contractor's job.[96] The plaintiff makes no discernible response to this argument.[97]

PNK cites the deposition testimony of Paul Barnes that PB employees were required to climb ladders and work on roofs at other work sites.[98] This is consistent with JC Myers testimony, *supra*, that PB always carried extension ladders because "you have to get on the roof of the buildings."[99] Renwick admits that PB employees used ladders to access work locations at other job sites.[100] The court agrees that the activity of climbing a ladder was an activity required by the job, and, as such, its attendant hazards were inherent in the independent contractor's job. Thus, the plaintiff has not met his burden to show that there is a genuine issue of material fact for trial under a theory of premises liability.

## CONCLUSION

For the reason set forth above, the court will grant PNK's motion for summary judgment dismissing the plaintiff's claims with prejudice. The court notes that there is a *Daubert* motion (R. #38) and a motion *in limine* (R. #40) filed and pending in this matter. However, because the ruling and judgment dismisses this case in its entirety, the court will not address these motions.

---

[96] Def. Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 30-3, p. 9).

[97] In a single sentence in the "Background Information" section of the plaintiff's opposition to the motion for summary judgment (Rec. Doc. 32, pp. 7-9), the plaintiff claims that PNK had a legal responsibility to provide a safe means of access to the rooftop fans and kitchen vents per the National Fire Protection Code ("NFPA 96"). In support of this contention, the plaintiff provides nothing more than an ambiguous excerpt of deposition testimony that is devoid of any reference to the specific provisions or language in the NFPA 96 and appears to discuss circumstances that differ from the facts at issue in this case.

[98] Deposition of Paul Barnes (Rec. Doc. 30-5 pp. 27-30, 44-46).

[99] Deposition of JC Myers (Rec. Doc. 30-6, pp. 56-57).

[100] Pl. Opp. to Statement of Uncontested Material Facts (Rec. Doc. 32-9, no. 6).

**THUS DONE AND SIGNED** in Alexandria, Louisiana, this 3rd day of April, 2017.


_____
JUDGE JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE